# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

LYNN S. HARTWELL-PLATER,     )
                   Plaintiff,   )
                            )  Civil Action No. 12-1660
    vs.                     )
                            )  Judge David Stewart Cercone
                            )  Magistrate Judge Maureen P. Kelly
                            )
CAROLYN W. COLVIN,[1]     )  Re: ECF Nos. 11, 13
Commissioner of Social Security  )
                   Defendant.  )

# REPORT AND RECOMMENDATION

## I.    RECOMMENDATION

It is respectfully submitted that the Motion for Summary Judgment filed by Plaintiff [ECF. No. 11] be denied.  It is further recommended that the Motion for Summary Judgment filed by Defendant [ECF No. 13] be granted.

## II.    REPORT

### A.    Procedural History

Plaintiff, Lynn S. Hartwell-Plater ("Plaintiff"), brought this action pursuant to 42 U.S.C. § 405(g), seeking review of the Commissioner of Social Security's final decision disallowing her claim for supplemental security income ("SSI") under Title XVI of the Social Security Act ("the Act"), 42 U.S.C. §§ 401-433, 1381-1383f.

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Defendant has consented to the substitution of Carolyn W. Colvin for Michael J. Astrue as the defendant in this suit. See also 42 U.S.C. § 405(g).

In her application for benefits filed on October 26, 2009, Plaintiff claimed an onset of disability of December 15, 2006, due to bipolar disorder, depression and schizophrenia (R. 165). The Social Security Administration denied her claim April 5, 2010, and on April 20, 2010, Plaintiff requested a hearing before an administrative law judge ("ALJ"). (R. 80 – 89).

A hearing was held on August 26, 2011, before Administrative Law Judge James Bukes ("the ALJ"), at which time Plaintiff, who was represented by counsel, and Mary Beth Kopar, an impartial vocational expert ("VE"), were called to testify. (R. 42 – 77).

On October 5, 2011, the ALJ issued his decision (R. 20 – 22), finding that,

(1) Plaintiff has not engaged in substantial gainful activity since the amended onset date of November 2009;[2] (2) Plaintiff has the severe combination of impairments of bipolar disorder, schizophrenia, and history of substance abuse; (3) Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404 Subpart P, Appendix 1; (4) Plaintiff's impairments, including her substance use disorder, leave her with a residual functional capacity to perform a full range of work at all exertional limits, but Plaintiff must be limited to working alone in a room with nothing more than very simple instructions at a self-directed pace and cannot perform even simple, repetitive tasks; (5) – (9) considering Plaintiff's age, education, work experience, and residual functional capacity based on all of her impairments, including her substance use disorder, there are no jobs that exist in significant numbers in the national economy that Plaintiff can perform; (10) if Plaintiff's substance abuse issue was removed from consideration, the remaining limitations

---

[2] SSI is not payable prior to the month following the month in which Plaintiff filed her application. 20 C.F.R. § 416.335. Although Plaintiff's October 2009 SSI application alleged disability beginning in December 2006, the relevant period begins in November 2009, and ends on the date of the ALJ's decision, October 5, 2011. Evidence dated outside of the relevant time period has been considered to complete the Plaintiff's medical history consistent with 20 C.F.R. 416.912(d).

would cause more than a minimal impact on Plaintiff's ability to perform basic work activities, causing the Plaintiff to have a severe impairment or combination of impairments, however; (11) if Plaintiff's substance abuse was not an issue, Plaintiff would not have an impairment or combination of impairments that meet or medically equals any of the impairments listed in 20 CFR Part 404 Subpart P, Appendix 1; (12) if substance abuse was not an issue, Plaintiff's residual functional capacity would be limited to simple instructions and repetitive tasks away from crowds or groups or people or in close coordination or proximity to others, and she would need to avoid anything more than simple decision-making, an assembly-line pace, intensive supervision and changes in the work setting; (13) – (15) if substance abuse was not an issue, Plaintiff would continue to be unable to perform past relevant work, but Plaintiff would not be disabled because considering her age, education, work experience and residual functional capacity, "there would be a significant number of jobs in the national economy that the claimant could perform;" and, therefore (16) Plaintiff's substance abuse disorder is a contributing factor material to the determination of disability because the claimant would not be disabled if she stopped the substance abuse and, therefore, she has not been disabled at any relevant time from the date of her benefits application. (R. 24 – 37).

The Appeals Council denied Plaintiff's request for review on September 13, 2012, making the ALJ's decision the final decision of the Commissioner. (R. 1 – 4). On November 12, 2012, Plaintiff filed suit in this Court seeking judicial review of the decision.

### B.    Factual Background

Plaintiff was born on October 9, 1962, and was 47 years old on the date she applied for benefits and 49 years old at the time of the hearing. (R. 45 – 46).  Plaintiff has a high school

diploma and received a two-year post-secondary certificate as a medical assistant from the Western School of Health and Business Careers. Plaintiff's work experience includes employment in the food service and janitorial industries, and she last worked in 2008 to 2009 providing childcare for her grandchildren. (R. 48). Since that time, Plaintiff's primary source of income has been public assistance.

### 1. Treatment History

Plaintiff has battled drug and alcohol issues since she was thirteen years old. With particular relevance to her current claim, Plaintiff was admitted to UPMC Braddock Hospital for detoxification on July 23, 2007. At the time of her admission, her daily intake included one and one half cases of beer, "plus or minus a pint of hard liquor," as well as daily use of $200 to $300 worth of crack cocaine." (R. 231). She had been treated at Braddock Hospital in the past, and admitted that she was suffering from hallucinations and blackouts. She also claimed that she was attending 12-step meetings. She denied any past psychiatric history, and her Axis I diagnosis included alcoholism, cocaine and nicotine addiction. Her GAF score on admission was 39.[3]

Plaintiff's medical records document that as part of court-ordered treatment in connection with a conviction for retail theft, she appeared at Mercy Behavioral Health Clinic on July 18, 2008, seeking mental health treatment on a walk-in basis. (R. 290). However, because the terms

---

[3] The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders (DSM–IV–TR) 34 (4th ed. 2000). An individual with a GAF score of 51–60 may have "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning." An individual with a GAF score of 41–50 may have "[s]erious symptoms (e.g., suicidal ideation ... )" or "impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." Id. An individual with a GAF score falling between 31– 40 exhibits either "[s]ome impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." Id. Depending on his or her precise circumstances, an individual with a GAF rating in this range may be "unable to work." Id.

of her house arrest and probation required an advance appointment, she was forced to leave after a confrontation with a corrections worker. (R. 290 – 91, 297 – 98). She was able to schedule an appointment and was seen for an initial intake on July 21, 2008. During that appointment, Plaintiff denied current drug use, and reported significantly worsening depression, weight loss, manic episodes, paranoia and command-type auditory hallucinations. (R. 321 – 22). She also reported a poor employment history, indicating she often quit jobs "out of paranoia or feeling that she is being treated unfairly." Id. She also reported difficulty getting along with people outside of her family or in social situations. Plaintiff's provisional diagnosis included bipolar mood disorder, psychosis and depression with a GAF score of 40. Id. The intake report notes that her cognition and intellection functioning were within normal limits, and her affect and behavior were within normal limits. (R. 293 – 95).

Treatment was scheduled to begin August 5, 2008, but Plaintiff canceled several appointments, finally appearing thirty minutes late on September 18, 2008, but admitting she was again using drugs and alcohol to "self-medicate" for depression and irritability. (R. 349 – 354). During this visit, Plaintiff acted appropriately with good grooming and hygiene, but acknowledged that she remained on house arrest. She was provided with psychotropic medication and was to schedule individual therapy two times per month. Id. However, she canceled most appointments, and when she did appear on October 28, 2008, she admitted that she was drinking alcohol, most days to the point of intoxication, and that she was frustrated with her inability to find a job due to her jail record. Her psychotropic medication was changed to provide additional relief. (R. 342- 348). During her next visit on November 20, 2008, Plaintiff's GAF score was 60, and she was noted to be on time and appropriate, with no presenting issues.

She requested that the therapist fill out forms to establish that she was disabled. This request was denied, but her treatment schedule was updated to reflect weekly individual counseling. However, Plaintiff failed to appear for counseling, and with the exception of one appointment in December, where it was suspected that she continued to use drugs and alcohol, Plaintiff canceled or failed to show for every appointment.  As a result, on February 9, 2009, her treatment file was closed by the clinic. (R. 326 – 340).

Plaintiff continued to use drugs through at least November 2009, just after filing her application for SSI benefits.  She was seen at Mercy Behavioral Health Clinic on October 8, 2009, seeking treatment and during the following month, was using approximately $100 worth of crack cocaine per day, drinking two cases of beer and a fifth of vodka daily, and smoking approximately $35 worth of marijuana per day. (R. 426 – 27). Plaintiff acknowledged that the marijuana made her paranoid, but she used it to help her "come down from crack." Id. She also could not eat and was ill without alcohol.  As of late 2009, Plaintiff's longest period of abstinence from drugs or alcohol was two years, one year while she was in jail and a second year while she participated in a "program."  Plaintiff acknowledged that her mental health condition was exacerbated or brought on by her substance abuse.  (R. 437) ("Consumer was able to talk about her bipolar and schizophrenic symptoms in a calm clear manner.  She [reports] wanting some help and believes her long terms drug use has caused her mental health problems.").

After applying for SSI, Plaintiff again sought treatment with the Mercy Behavioral Health Clinic and she was scheduled to be treated for polysubstance dependence and schizoaffective disorder for the period January 1, 2010 through January 14, 2010. Her treatment was to include an intensive out-patient drug and alcohol program, and she was scheduled to meet

three times a week for three hours per day.  (R. 413).  Plaintiff failed to appear for any session

and her case was closed on January 14, 2010, due to non-compliance with attendance.  Id.

Plaintiff called again to schedule treatment on January 20, 2010, and during the intake

assessment, was noted to currently be using alcohol, crack and marijuana. (R. 415 – 16). When

she arrived for her first appointment, however, she indicated that her "clean" date from drug and

alcohol use was November 16, 2009.  She claimed she could not attend the sessions earlier in the

month due to "medical leave."  She reported depression, paranoia, and hearing voices.  (R. 438).

She stated she would return to dual intensive out-patient mental health and drug and alcohol

treatment. On February 2, 2010, Plaintiff was seen by Dr. Javaherian at Mercy Behavioral Health

Clinic.  Plaintiff reported auditory hallucinations and was provided a prescription for Seroquel,

but was noted not to be under any immediate stress, was cooperative, had organized thoughts,

fair cognition and insight, and no suicidal or homicidal delusions.  Plaintiff's records indicate

that successful completion of the program would require attendance three times per week, for

three hours each day, and participation in group therapy, psycho-education, discussion and

medication management to facilitate continued sobriety and mental health symptom

management.  For the period January 25, 2010 to May 4, 2010, she attended only thirteen group

sessions and two individual sessions.  Plaintiff's file was again closed on July 21, 2010, for lack

of attendance.

On April 23, 2010, Plaintiff underwent a laparoscopic hysterectomy to treat recurring

fibroids.  Her preoperative review indicates that she was clean of alcohol and cocaine for three

months and that while she did not get regular exercise, she plays with her grandchildren, walks

all over the North Side and does heavy housework.  The treating surgeon noted "[s]he has good

functional status," and that she is "a healthy, well-developed, well-nourished female in no acute distress." (R. 599). On admission, Plaintiff reported that she was able to care for herself and independently complete household chores, shopping, cleaning, and money management. She also did not report any psychological fear or depression. (R. 632). Plaintiff was discharged from the hospital on April 24, 2010, and instructed not to drive for four weeks and to limit weight-bearing activity until her follow-up visit four weeks later. There is no indication that Plaintiff returned for her follow-up exam.

Plaintiff contacted Mercy Behavioral Health on August 17, 2010, to start mental health treatment for worsening bipolar, schizophrenia and depression disorders, as well as auditory hallucinations. (R. 417). Plaintiff claimed that she missed her previously scheduled appointments because of medical issues and stated that she had been clean of alcohol and cocaine for nine months. Plaintiff also stated that she was feeling paranoid and was aggressive and assaulting her boyfriend and breaking objects, throwing furniture and banging walls. She requested medication, and reported a bad reaction to the Seroquel previously prescribed. (R. 438). She was provided a GAF score of 40 and scheduled for outpatient therapy. (R. 443). However, she canceled her first appointment on August 24, 2010, but called on August 27, 2010, seeking the completion of disability related paperwork by Dr. Javaherian, which was declined. (R. 446 – 48). Plaintiff attended three group therapy sessions on August 31, 2010 (GAF score of 50), September 14, 2010 (GAF score of 50) and September 21, 2010 (GAF score of 45) and reported that she was doing "okay," but was upset because she had been arrested for assault after fighting with a man she had obtained a Protection From Abuse order against. (R. 455). Plaintiff reported that her auditory hallucinations were worse and that she was depressed. Plaintiff

canceled her next appointment, but did attend her final group session on September 27, 2010 (GAF score of 35) where she reported that her husband was abusive and so she decided to leave him and move in with her daughter. (R. 458). She called next on October 4, 2010, to request couples therapy after an argument that resulted in police involvement. (R. 459 – 60). Plaintiff then canceled her next three appointments.

On September 14, 2010, Plaintiff was seen at the North Side Christian Health Center, again asking to have disability related paperwork completed. She reported no depression, and stated that since her hysterectomy, her energy levels had increased and she had been "feeling well." (R. 508). She indicated she was having auditory hallucinations, but her mood was stable and she remained clean from crack cocaine for ten months. She indicated that she had recently been turned down for SSI benefits. Physician's Assistant Christine Guy ("P.A. Guy") reported that Plaintiff was in no acute distress, was pleasant and nicely groomed. Plaintiff indicated she was able to participate in usual activities, had a good appetite, no weight loss or gain and good exercise tolerance. Her assessment included chronic schizophrenia and it was suggested that she continue to follow-up with Dr. Javaherian at Mercy Behavioral Health. However, Plaintiff had canceled her previous appointment with Dr. Javaherian and her medical records reflect that she did not return to treatment with him.

Plaintiff was next seen by P.A. Guy on September 28, 2010, seeking hormone replacement therapy for hot flashes, which was declined because of her status as a smoker. Her exam was otherwise normal and she denied any domestic violence issues. At Plaintiff's appointment on November 30, 2010, Plaintiff admitted that she had consumed alcohol to the point of intoxication twice in the prior week. She was still having hot flashes and was

experiencing difficulty sleeping.  She also denied current domestic violence and remained in a relationship with her boyfriend. (R. 518).

Plaintiff was seen at Allegheny General Hospital in January 2011 for the excision of two fatty lipomas on her left hip, which were surgically removed on an outpatient basis. (R. 490 – 95).  Following the surgery, the surgeon reported that Plaintiff was doing well with no postoperative problems or issues.

On February 18, 2011, Plaintiff contacted Mercy Behavioral Health seeking to return to therapy.  She had a current simple assault charge filed against her, and had not taken her Seroquel medication for two to three months.  She reported that she was depressed and angry, had suicidal thoughts and had become assaultive, hitting, kicking and punching.  She had auditory hallucinations, with voices telling her to harm herself and others. (R. 538 – 40). An appointment was scheduled for her to be seen, and she attended one session but failed to show for three additional sessions, and her treatment file was again closed. (R. 543 – 46).

Plaintiff returned to P.A. Guy on March 24, 2011, to refill a prescription for citalopram[4] for depression.  At this appointment, Plaintiff acknowledged that she had not seen Dr. Javaherian for over nine months but she also stated that she had not been suffering from manic episodes, bipolar issues, hallucinations, paranoia, sleep disturbance, or weight or appetite changes. (R. 522). Plaintiff was instructed to re-establish care with Mercy Behavioral Health clinic, but failed to do so.

On May 5, 2011, Plaintiff again called Mercy Behavioral Health, reporting that she had relapsed on alcohol and marijuana when her mother passed away five weeks earlier. She was having apparent manic episodes, was injuring herself, lashing out physically at her boyfriend,

_____
[4] Also referred to by the brand name of Celexa®.

was suffering from auditory hallucinations and depressed and agitated. (R. 547 – 49). An appointment was scheduled for May 12, 2011, but Plaintiff called that day to reschedule the appointment for May 19, 2011. Plaintiff called again on May 25, 2011, and reported that she had also been using cocaine with the alcohol and marijuana. On June 1, 2011, Plaintiff acknowledged that she had consumed two cases and one fifth of vodka over two days on May 31, 2011, and had been drinking three times per week. (R. 557). She used over $400 worth of crack cocaine on May 15, 2011, and had smoked "a dime bag" of marijuana on May 31, 2011. Notably, she also acknowledged that her auditory hallucinations began with use of crack cocaine. (R. 562). She was scheduled to begin alcohol and drug treatment again on June 6, 2011. There are no medical records after June 2011, so it is no known whether Plaintiff appeared for or completed the treatment program.

Careful review of Plaintiff's records therefore reveals that for those time periods where she consistently remained sober, in therapy and/or on appropriate medication, Plaintiff felt well and was able to independently care for herself and her household. In addition, she was able to regularly visit the library, use the computer and take long walks in the park.

### 2. Functional Capacity Evaluations

On February 11, 2010, Charles M. Cohen, Ph.D., conducted a psychological evaluation of Plaintiff on behalf of the Bureau of Disability Determination. (R. 260 – 66). Dr. Cohen noted that Plaintiff arrived to the evaluation on her own by bus and was "meticulously attired." She also was "oriented to person, place, and time and her remote and recent past memory appeared to be grossly intact." In addition, "[h]er eye contact was good[,]" "[t]here were no

abnormalities of behavior or psychomotor activity noted." Plaintiff reported being independent with regard to personal grooming and was able to clean shop and cook.

During the evaluation, Plaintiff displayed paranoid behavior, discussed auditory hallucinations, and gave "bizarre" answers to questions. When pressed as to blatantly wrong answers to simple addition problems, Plaintiff corrected her answers. Dr. Cohen concluded that Plaintiff did appear to be paranoid and, based on her functional levels and presentation, she would not be capable of "coming to work on time, of dealing effectively with authority figures or peers, or concentrating well enough to perform even simple repetitive tasks." (R. 263). Dr. Cohen's conclusions, however, were specifically limited by his admitted inability to review prior medical records to determine if Plaintiff's presentation of mental illness on the day of her evaluation was supported, in fact, by her medical history. Dr. Cohen's explicit hesitation to diagnose Plaintiff was based upon evidence of behavior consistent with malingering and his finding that "[h]er reliability is very questionable." (R. 262).

On March 3, 2010, Kerry Brace, Psy.D, a non-examining state agency psychologist, completed a Mental Residual Functional Capacity Assessment ("RFC") of Plaintiff to assess the extent of her alleged disability due to bipolar, depression and schizophrenic disorders, as well as her claim during the course of her mental status exam that hallucinations were affecting her ability to function. (R. 373 – 90). Dr. Brace reviewed the Plaintiff's medical records from her detoxification at Braddock Hospital in 2007, where she admitted to hallucinations and blackouts in conjunction with the $300 per day cocaine use. Dr. Brace also reviewed the Field Office report prepared in conjunction with Plaintiff's application for benefits and found particular relevance to the statement that "[t]he claimant was very articulate and well organized for her

disability claim," although "she had some difficulty with exact dates." (R. 390). In addition, Dr. Brace reviewed the psychological evaluation performed by Dr. Cohen and the findings concerning questionable reliability and answers consistent with malingering. Dr. Brace concluded that the medical evidence established a medically determinable impairment of alcoholism, cocaine addition, mixed substance dependency, with a probable psychotic disorder. He noted that Plaintiff has not had any recent hospitalizations due to her mental impairment.

Dr. Brace determined that Plaintiff was capable of performing simple, routine, repetitive work, in a stable environment, and that she was capable of understanding simple instructions and work at a consistent pace, with regular and punctual attendance. He further determined that while her limitations in all areas were significant, they were not so severe as to preclude performance of routine work.

In arriving at his findings, Dr. Brace rejected Dr. Cohen's assessment that Plaintiff was not capable of employment. Dr. Brace concluded that Dr. Cohen overestimated the degree of Plaintiff's impairment because, as conceded by Dr. Cohen, he did not have access to all of the medical and non-medical evidence in the claims folder.

### 3. Hearing Testimony

At the administrative hearing before the ALJ on August 26, 2011, Plaintiff testified that she has not worked since 2009, primarily because of feelings of paranoia and auditory hallucinations. Plaintiff's last positions included seasonal food service work and child care. She stated that her current source of income consists of payments from the DPA. (R. 48 – 49). Plaintiff testified that except for a relapse in April 2011, she has been clean from drug and

alcohol use since November 2009, and has sought treatment through the Mercy Behavioral

Health clinic at least once per week, except when she was on "medical leave." (R. 49 – 50).

Plaintiff testified that she cannot handle even light duty work because she is unable to

concentrate and, "because people don't like [her,]" she is given the most difficult tasks. (R. 53).

This tends to make her angry "and cuss" or otherwise act in a rude manner. (R. 61). Plaintiff

also has difficulty riding the bus, because she thinks people are laughing at her and so can only

ride for five to ten minutes. (R. 60).

Plaintiff testified that she hears voices telling her to hurt herself or tear up her house. The

voices are mean to her and she feels compelled to listen, whether it involves hitting someone or

cleaning her house. Plaintiff has been arrested for domestic violence and was jailed for one to

two days until bond was posted. She was assigned to attend anger management classes. Plaintiff

also has suicidal thoughts. She has been taking medication for years, but feels it doesn't work

very well. Plaintiff testified that she has no appetite and has lost twenty-five to thirty pounds.

Plaintiff described a typical day, starting with either breakfast or a drug and alcohol

meeting, and then a visit to the library or the park. At the library, she reads and uses the

computer. She rents movies, does her own shopping, cooking, cleaning and laundry. (R. 54).

She can groom herself, however her daughter helps with her hair. She socializes with old

friends, but finds making new friends difficult. She routinely watches her grandchildren, though

they think she is mean.

Plaintiff's husband James Plater testified in support of his wife's application for benefits.

He described her abusive tendencies and the need to request assistance from the police on a fairly

frequent basis. He admitted she does not take her medication as prescribed, and that she needs

frequent reminders. Mr. Plater testified that he and his wife shop together and both do chores

and that she cooks, clean and does laundry. He drives Plaintiff to family gatherings and they

attend AA and NA meetings and church. (R. 67 – 72).

Independent vocational expert Mary Beth Kopar was also called to testify at the hearing

and categorized Plaintiff's past work as an unskilled cleaner and cook's helper at the SVP 2

level, requiring medium exertion, and as a child monitor at the semi-skilled SVP 3 level,

requiring medium exertion. (R. 73). The ALJ asked Ms. Kopar whether a hypothetical

individual of Plaintiff's age, educational background, and work experience would be eligible for

employment in a significant number of jobs in existence in the national economy if limited to

work involving only simple, routine tasks, with no more than simple instructions, and avoiding

work-place changes, with no fast-laced production pace work, no interaction with the public or

crowds, and minimal interaction with co-workers and supervisors. (R. 73 -74). In response, Ms.

Kopar explained that such a person would be capable of obtaining employment as a laundry

worker at a medium exertion, with over 200,000 positions in the national economy, or as an

unskilled cleaner, at light exertion, with over one million positions in the national economy; or as

a sorter at light exertion, with over 300,000 positions in the national economy. Id. When asked to

consider the effect on employability if the hypothetical person needed to work alone, with no one

else in the room, Ms. Kopar reduced the availability of employment as either a laundry worker or

as a sorter to 100,000 positions in the national economy. Id. Ms. Kopar conceded that if, as

determined by Dr. Cohen's assessment (based on the information available to him) the

hypothetical person's concentration would prevent the performance of even simple, repetitive

tasks, she would be precluded from work in the national economy. (R. 75). On cross-

examination, Ms. Kopar also noted that in order to meet work expectations, the hypothetical employee would need to remain on task for eighty-five percent of the time.

### C.    Standard of Review

To be eligible for Social Security benefits under the Act, a claimant must demonstrate to the Commissioner that he or she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least twelve months. 42 U.S.C. § 423(d)(1)(A); Brewster v. Heckler, 786 F.2d 581, 583 (3d Cir. 1986). When reviewing a claim, the Commissioner must utilize a five-step sequential analysis to evaluate whether a claimant has met the requirements for disability. 20 C.F.R. §§ 404.1520, 416.920.

The Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, App'x 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §§ 404.1520(a) (4), 416.920(a)(4); see Barnhart v. Thomas, 540 U.S. 20, 24–25 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. Doak v. Heckler, 790 F.2d 26, 28 (3d Cir. 1986).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute, and is plenary as to all legal issues. 42 U.S.C. §§ 405(g)[5], 1383(c)(3);[6] Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 431 (3d Cir. 1999). Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based; and the court will review the record as a whole. See 5 U.S.C. § 706. The district court must then determine whether substantial evidence existed in the record to support the Commissioner's findings of fact. Burns v. Barnhart, 312 F.3d 113, 118 (3d Cir. 2002).

Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. Ventura v. Shalala, 55 F.3d 900, 901 (3d Cir. 1995) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); Richardson, 402 U.S. at 390. When considering a case, a district court cannot conduct a de novo review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. Palmer v. Apfel, 995 F.

---

[5] Section 405(g) provides in pertinent part:

Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

[6] Section 1383(c)(3) provides in pertinent part:

The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

Supp. 549, 552 (E.D.Pa. 1998); S.E.C. v. Chenery Corp., 332 U.S. 194, 196–97 (1947). The court will not affirm a determination by substituting what it considers to be a proper basis. Id. at 196–97. Further, "even where this court acting de novo might have reached a different conclusion ... so long as the agency's fact-finding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190–91 (3d. Cir. 1986).

### D.    Discussion

Based upon the medical record in this case, the ALJ found that Plaintiff experienced medically determinable severe impairments of drug and alcohol abuse in current remission, bipolar disorder and schizophrenia. The ALJ found further that because of Plaintiff's persistent abuse of drugs and alcohol, Plaintiff was disabled from working.  However, the ALJ determined that if Plaintiff abstained from drug and alcohol abuse ("DAA"), she would be capable of a full range of exertional employment limited to simple instructions and simple repetitive tasks, but would need to avoid working closely with others or the public, intensive supervision and changes in the work setting, as well as an assembly-line pace.  Based upon the testimony of the vocational expert, full-time work accommodating these limitations exists in the national economy.  As a result, the ALJ concluded that without DAA, Plaintiff was not disabled, and was not, therefore, entitled to disability benefits.

Plaintiff appeals from the ALJ decision, arguing that: (1) the ALJ erred when he concluded that DAA were material to Plaintiff's disability; (2) the RFC finding is not supported by substantial evidence; and, (3) the vocational expert testimony relies inappropriately upon an

incomplete RFC and therefore does not provide substantial evidence for the denial of Plaintiff's benefits.

        **1.**      **Substantial evidence supports finding that Plaintiff's DAA is material to her disability**.

Plaintiff contends that any limitations attributable to DAA were not sufficiently delineated from her other mental impairments so as to provide a basis for the ALJ's conclusion that without DAA, Plaintiff would be capable of engaging in gainful employment.  Plaintiff asserts that during her purported period of sobriety from November 2009 through April 2011, she continued to be depressed, experience auditory hallucinations and anger.  In addition, Dr. Cohen found that she was incapable of concentrating well enough to perform even simple tasks or consistently arrive to work on time.  Thus, Plaintiff contends even without DAA, she was significantly disabled.  Given the record before the ALJ, the Court finds Plaintiff's argument to be unavailing.

As with all Social Security cases, a claimant must prove to the Commissioner that he or she is incapable of engaging in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A); <u>Brewster</u>, 786 F.2d at 583. When reviewing a claim, the Commissioner must utilize a five-step sequential analysis to evaluate whether a claimant has met this requirement. 20 C.F.R. §§ 404.1520, 416.920. Assuming a claimant meets his or her burden at Steps 1 through 4, Step 5 places a burden upon the Commissioner to prove that a particular claimant is able to perform substantial gainful activity in jobs available in the national economy. <u>Doak</u>, 790 F.2d at 28.

In cases involving DAA, however, the Step 5 analysis takes on an additional component. The Act states that "an individual shall not be considered to be disabled ... if alcoholism or drug addiction would ... be a contributing factor material to the Commissioner's determination that the

individual is disabled." • <u>Ambrosini v. Astrue</u>, 727 F. Supp.2d 414, 428 (W.D. Pa. 2010) (quoting 42 U.S.C. §§ 423(d)(2)(c), 1382c(a)(3)(J)). According to 20 C.F.R. §§ 404.1535 and 416.935, the "key factor" in making the above conclusion is determining whether a claimant would continue to be disabled if he or she ceased to use drugs and/or alcohol. <u>See</u> <u>also</u> <u>Nomes v. Astrue</u>, 2010 WL 3155507 at *7-8 (W.D. Pa. 2010) (quoting <u>Warren v. Barnhart</u>, 2005 WL 1491012 at *10 (E.D. Pa. 2005)).

Side effects of drug and alcohol abuse, and any impact on other existing impairments, must be isolated so that the remaining limitations may be assessed. Soc. Sec. Ruling, SSR 13–2p.; Titles II & XVI: Evaluating Cases Involving Drug Addiction & Alcoholism (DAA), 2013 WL 621536, Docket No. SSA–2012–0006 (S.S.A Feb. 20, 2013).[7] It is the ALJ's responsibility to assess the impact of the remaining limitations on a claimant's ability to work, and if it is not possible to distinguish between the limitations created by DAA or the claimant's other impairments, to find that DAA is not a contributing factor material to disability. <u>Id</u>. This "materiality finding must be based on medical evidence, and not simply on pure speculation about the effects that drug and alcohol abuse have on a claimant's ability to work." <u>Ambrosini</u>, 727 F. Supp.2d at 430 (citing <u>Sklenar v. Barnhart</u>, 195 F. Supp.2d 696, 699-706 (W.D. Pa. 2002)).

It is undisputed that throughout the case record, there is significant evidence of Plaintiff's difficulties with DAA. The ALJ analyzed—at length—the effects of Plaintiff's DAA on her

---

[7] The Court recognizes that the ALJ could not have relied on this Social Security Ruling in making its determination on October 5, 2011, as the Ruling became effective on March 22, 2013. However, this Ruling expressly makes obsolete Emergency Message 96200, which was an internal policy to provide guidance to SSA employees tasked with processing claims for benefits, and which provided for similar delineation in accordance with the regulations at 20 C.F.R. § 416.935 ("How we will determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability.").

functional capacity and deduced what limitations would exist if Plaintiff remained clean and sober.

The ALJ determined, at steps two and three of the sequential analysis, that Plaintiff had severe impairments including bipolar and schizophrenic disorders and drug and alcohol abuse, but that these impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 6 – 7). Thereafter, the ALJ considered the limitations occasioned by the combination of Plaintiff's impairments, including her substance abuse, and found that with such impairments, Plaintiff's residual functional capacity ("RFC") left her able to perform a full range of work at all exertional levels, but that her non-exertional limitations so restricted her, there were no jobs in significant numbers in the national economy that she could perform. Accordingly, the ALJ found Plaintiff disabled. (R. 8).

The ALJ then separately assessed the impact of Plaintiff's DAA on her daily life and adequately supported his determination that DAA was material to Plaintiff's disability. Plaintiff's medical records confirm that her self-reported history of paranoia and hallucinations co-existed almost exclusively with DAA, and that in the limited time she complied with medication and therapeutic counseling and abstained from DAA, her mental state was less impaired and her symptoms could be controlled.

Prior to her nine months of purported sobriety (February 2010 through November 2010), Plaintiff candidly acknowledged that her mental health condition was exacerbated or brought on by her substance abuse and that her difficulty in finding employment resulted not from mental illness, but from her criminal record. (R. 342 – 48). While being treated for detoxification at Braddock Hospital in 2007, Plaintiff admitted no preexisting mental health issues, but

complained of hallucinations and blackouts in conjunction with her daily intake of a pint and a half of hard liquor and significant use of crack cocaine. (R. 231). In 2008, Plaintiff sought court-ordered DAA treatment with Mercy Behavioral Health. Plaintiff was diagnosed provisionally with combined DAA and bipolar and schizophrenic disorders, but her appearance was noted to be normal, with no outward evidence of hallucinations and an easily established rapport. Subsequently, Plaintiff routinely canceled or failed to appear for treatment sessions and when she did appear, she admitted she was using drugs and alcohol to the point of intoxication. This pattern continued through at least February 2010, when she was seen by Dr. Javaherian, who noted that Plaintiff was not under any immediate stress, was cooperative, had organized thoughts, fair cognition and insight and no suicidal delusions. Dr. Javaherian prescribed Seroquel for thirty days.

Dr. Javaherian's observations were confirmed in April 2010, when Plaintiff was admitted to Magee Women's Hospital for a hysterectomy. At that time, Plaintiff reported that she was clean of alcohol and cocaine for three months and was able to play with her grandchildren, walk all over the North Side, perform heavy housework, independently care for herself and complete chores, shopping, cleaning and money management. When directly asked, Plaintiff denied any psychological fear or depression. (R. 632). This period of apparent sobriety and improved mental state coincided with Plaintiff's attendance at therapy sessions for thirteen sessions from late January 2010 through April 2010 and partial compliance with medication.

The ALJ noted that Plaintiff's subsequent complaints of worsening mental health symptoms coincided with her failure to attend therapy and maintain prescribed medication regimens. Plaintiff's last thirty day prescription for Seroquel was filled in February 2010, and

her last therapy session was sometime in April 2010. (R. 368). During the months of August and September 2010, Plaintiff reported feelings of paranoia and auditory hallucinations, but upon returning to treatment, she was feeling well by mid-September when she was seen at her primary care physician for the purpose of having paperwork filled out. At that appointment, she denied feeling depressed, and her mood was stable. Plaintiff reported that she had regular auditory hallucinations. (R. 508). However, Plaintiff was not taking medication (her last Seroquel prescription was filled in February), and yet she also reported that she was able to do her usual activities, had a good appetite, no fatigue and no weight loss. (R. 509). In the following two weeks, her records at Mercy Behavioral Health indicate domestic issues and worsening depression, but in a visit with her primary care physician on September 28, 2010, Plaintiff discussed menopausal symptoms, tobacco cessation, her hepatitis c status, sexual activity, denied domestic violence and otherwise appeared well. Plaintiff's last therapy session appears to have been September 27, 2010. (R. 543).

By the end of November 2010, Plaintiff reported that she was drinking alcohol to the point of intoxication twice per week, and was unable to sleep due to hot flashes related to menopause. (R. 518). Plaintiff was prescribed Citalopram (an anti-depressant) and remained symptom and substance free through her next follow-up appointment in March 2011, when she again appeared to be well and reported the absence of mania, hallucinations, sleep issues, paranoia or suicidal thoughts. (R. 522 – 23). Unfortunately, Plaintiff again relapsed and began using both cocaine and substantial amounts of alcohol in April 2011 through May 2011 and by June 2011 reported the return of depression, poor concentration and hallucinations.

Based upon these objective medical observations contained within Plaintiff's treatment notes, the ALJ found that Plaintiff's mental state substantially improved when she remained compliant with medication and therapy regimens. He then formulated a hypothetical and RFC assessment based upon the evidence presented, and determined that in the absence of DAA, Plaintiff's limitations were not significant enough to preclude her from all full-time work, especially given her frequent library visits and computer use, daily walking regimen and her ability to care for herself and her household while sober. As a result, the ALJ determined that Plaintiff's DAA was material to a finding of disability, and that Plaintiff was therefore not entitled to benefits. The ALJ completed the proper analyses, as required, and bolstered his decision with substantial evidence from the record. Plaintiff has put forth no evidence that undermines the ALJ's conclusions.

### 2. The RFC finding is supported by substantial evidence.

Plaintiff next contends that the ALJ's assessment of her Residual Functional Capacity failed to incorporate the marked limitations noted by agency review physician, Dr. Bruce. In particular, Plaintiff complains that the ALJ's finding that absent DAA, Plaintiff could perform simple instructions and simple repetitive tasks, is not supported by Dr. Brace's finding of moderate limitations in these areas and fails to consider Dr. Braces findings of marked limitations in Plaintiff's ability to interact with the general public.

An RFC assessment "'is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).'" Burnett v. Commissioner of Social Security, 220 F.3d 112, 121 (3d Cir. 2000) (quoting Hartranft v. Apfel, 181 F.3d 358, 359 n. 1 (3d Cir. 1999)). In determining a claimant's RFC, an administrative law judge must consider all the

evidence of record and the claimant's subjective complaints and statements concerning his limitations. 20 C.F.R. §§ 404.1545(a), 416.945(a), and 416.920.

As noted by the Commissioner, Plaintiff's contention that the ALJ did not consider Dr. Brace's findings is predicated upon the "Summary Conclusions" section of the report, which is explained in detailed narrative form in conjunction with Dr. Brace's Functional Capacity Assessment, as follows:

> The claimant can perform simple, routine, repetitive work in a stable environment. She can understand, retain, and follow simple job instructions, i.e., perform one and two step tasks. She is capable of working within a work schedule and at a consistent pace. She would be able to maintain regular attendance and be punctual. Moreover, she would not require special supervision in order to sustain a work routine. She is capable of asking simple questions and accepting instruction. Additionally, she can function in production oriented jobs requiring little independent decision making. Her limitations in all areas evaluated are significant, but not so severe as to preclude performance of routine work tasks.

[ECF No. 4-10, p. 5]. It is clear that Dr. Brace's summary conclusions of marked inability to work with the public and moderate impairment to Plaintiff's ability to concentrate and follow instructions are not so broad as to preclude employment in certain production oriented jobs. Plaintiff's argument that the ALJ ignored Dr. Brace's findings regarding Plaintiff's ability therefore is unavailing.

### 3. The vocational expert testimony is supported by substantial evidence.

Plaintiff contends that the ALJ's hypothetical question posed to the vocational expert seeking information regarding available employment failed to reflect all of the impairments contained in Dr. Brace's report. Therefore, Plaintiff argues that the ALJ's reliance upon the vocational expert's testimony was error.

A hypothetical based upon the ALJ's RFC assessment and posed to the vocational expert "may only be considered for purposes of determining disability if the question accurately portrays the claimant's individual ... impairments." Burns v. Barnhart, 312 F.3d 113, 123 (3d Cir. 2002) (quoting Podedworny v. Harris, 745 F.2d 210, 218 (3d Cir. 1984)). To be considered substantial evidence, the vocational expert's testimony must have been based upon a hypothetical reflecting all medically undisputed evidence of impairment. Allen v. Barnhart, 417 F.3d 396, 407 (3d Cir. 2005) (citing Ramirez v. Barnhart, 372 F.3d 546 (3d Cir.2004)). See also Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d. Cir.1987).

As indicated by the Commissioner, the question posed to the vocational expert accurately reflected a hypothetical individual of Plaintiff's age, education, and work experience, who was limited to simple instructions and should avoid crowds or groups of people, and who should also avoid the following: working in close coordination with or proximity to others, anything more than very simple decision-making; assembly-line pace; intensive supervision and changes in work setting. Review of the record in this action reveals that the hypothetical question accurately accounted for all of Plaintiff's medically documented limitations, and therefore properly constitutes substantial evidence supporting the ALJ's find that that Plaintiff is not disabled.

### F.     Conclusion

Summary judgment is appropriate when there are no disputed material issues of fact, and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; Edelman v. Commissioner of Social Sec., 83 F.3d 68, 70 (3d Cir. 1996). In the instant case, there are no material factual issues in dispute. It appears that the ALJ conducted a thorough review of the

evidence and his conclusion is supported by substantial evidence.  For this reason, it is recommended that Plaintiff's Motion for Summary Judgment be denied, that Defendant's Motion for Summary Judgment be granted, and that the decision of the Commissioner be affirmed.

In accordance with the Magistrate Judges Act, 28 U.S.C. § 636(b)(1), and Local Rule 72.D.2, the parties are permitted to file written objections in accordance with the schedule established in the docket entry reflecting the filing of this Report and Recommendation.  Failure to timely file objections will waive the right to appeal.  Brightwell v. Lehman, 637 F.3d 187, 193 n. 7 (3d Cir. 2011).  Any party opposing objections may file their response to the objections within fourteen (14) days thereafter in accordance with Local Civil Rule 72.D.2.

Respectfully submitted,

/s/ Maureen P. Kelly
MAUREEN P. KELLY
UNITED STATES MAGISTRATE JUDGE

Dated:  October 16, 2013

cc: All counsel of record via CM-ECF